UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                    :

RHAWN JOSEPH,                         :

                         :

          Plaintiff,          :

                         :        20 Civ. 4672 (JPC)

      -v-                  :

                         :            OPINION

SPRINGER NATURE *et al.*,     :     AND ORDER

                         :

         Defendants.      :

                         :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Rhawn Joseph, Ph.D., proceeding *pro se*, is a scientist who claims he found evidence of possible extraterrestrial life on Venus and Mars. To expound his ideas here on Earth, Dr. Joseph wrote two articles—one about life on Venus, the other about life on Mars—and submitted them for publication in an academic journal called *Astrophysics and Space Science* ("ApSS"). ApSS published the article about Venus, and the piece received some traction in the scientific community. But before publishing the article on Martian life, ApSS told Dr. Joseph that it needed to vet his findings a bit more. Dr. Joseph did not like the sound of that. So he withdrew his submission of the Mars article and demanded that ApSS remove the Venus article from its website. Rather than remove the Venus article, and after conducting additional peer review, ApSS told Dr. Joseph that it would retract the article.

Dr. Joseph responded by filing this suit and alleging copyright infringement, breach of contract, libel, and a host of other tort claims against various ApSS-affiliated entities and individuals. He demands damages of at least $1 billion and injunctive relief. Before the Court is certain Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure.  For the reasons that follow, the Court grants the motion and dismisses this

action as to all Defendants.

## I.  Background

### A.  Factual Background

The following factual allegations are taken from the Second Amended Complaint, Dkt. 19

(the "Complaint" or "Compl."), and any documents incorporated by reference.  *See Kleinman v.

Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).  The Court "accept[s] as true the factual allegations

in the [C]omplaint and draw[s] all inferences in the plaintiff's favor."  *Biro v. Conde Nast*, 807 F.3d

541, 544 (2d Cir. 2015).[1]

Dr. Joseph's scientific career began in the 1970s, and over the past several decades he has

published studies in a broad array of fields including "neuroscience, brain and child development,

evolution, quantum physics, consciousness, genetics, and astrobiology."  Compl. ¶ 21.   More

recently, Dr. Joseph has focused his research on the cosmos and considers himself "one of the

leading figures in the search for extraterrestrial life."  *Id.* ¶ 20; *see id.* ¶ 40 (describing himself as

"one of the pioneers and leading authorities" on the subject of whether there is "life on other

planets").  He claims that he has found evidence, albeit not conclusive proof, of life on two of

Earth's neighbors.  *Id.* ¶ 20.  With regard to his work on the Red Planet, he says he is "the pioneer

who is the first to provide direct physical, visual evidence of what appears to be life, i.e. fungi,

---

[1] The Complaint is at times difficult to follow.  It is littered with speculation, confusing ramblings, conclusory legal assertions, and personal attacks against Defendants.  *See, e.g.*, Compl. ¶ 12 ("The Defendants are lying, confabulating, engaging in fraud and falsifying their references[.]"), ¶ 20 (claiming that "major scientific discoveries must pass through three stages: 1) Ridicule, 2) Violent opposition, 3) Acceptance as obvious and self-evident" and that Dr. Joseph's work regarding life on Venus and Marks "is now at stage 2 (violent opposition)"); ¶ 23 (calling the two individual Defendants "mediocrities"); ¶ 30 ("Defendants libeled and slandered Plaintiff in April of 2020.").  Because Dr. Joseph is proceeding *pro se*, the Court endeavored to distill the facts from the Complaint as best it could and construe them in the light most favorable to him.

algae, lichens on the surface of Mars." *Id.*

The events at issue here began when Dr. Joseph submitted articles for publication in ApSS, a journal that specializes in astronomy, astrophysics, and other sciences related to outer space. *See Id.* ¶¶ 3-5. ApSS is owned by a company called Springer or Springer Nature, or one of its subsidiaries. *See id.* ¶¶ 3, 64; Dkt. 56 ("Motion to Dismiss") at 3.

In October 2019, Dr. Joseph submitted to ApSS an article titled "Life on Venus and the interplanetary transfer of biota from Earth" ("Life on Venus"). Compl. ¶ 4; Dkt 57-1. This article included images of what Dr. Joseph says are "fungal mushroom-shaped organisms . . . on the surface of Venus" and suggested that "billions of organisms . . . were likely transported to Venus" when spaceships crashed on the planet. Dkt. 57-1 at 3, 9.; *see also* Compl. ¶ 18. As part of the submission process for "Life on Venus," Dr. Joseph entered into a licensing agreement with ApSS. *See* Compl. ¶¶ 24-25. While this agreement was not attached to the Complaint, Defendants submitted it as part of their motion to dismiss. *See* Dkt. 57-2. The Court considers this agreement at this stage because the Complaint incorporates it by reference and "relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (internal quotation marks omitted). The agreement explained Springer Nature would "consider" publishing the article and stated in relevant part:

> Subject to editorial acceptance of the Article, it will be published under the Creative Commons licen[se] shown above. In consideration of the Licensee evaluating the Article for publication, the Author(s) grant the Licensee a non-exclusive, irrevocable and sub-licensable right, unlimited in time and territory, to copy-edit, reproduce, publish, distribute, transmit, make available and store the Article, including abstracts thereof, in all forms of media of expression now known or developed in the future, including pre- and reprints, translations, photographic reproductions and extensions.

Dkt. 57-2 at 1-2. In addition to this license to publish "Life on Venus," the agreement also included a provision that stated: "The Author(s) agree(s) that the Licensee may retract the Article or publish

a correction or other notice in relation to the Article if the Licensee considers in its reasonable opinion that such actions are appropriate from a legal, editorial or research integrity perspective." Dkt. 57-2 at 5.  ApSS subsequently published "Life on Venus."  Compl. ¶¶ 4, 9.

In April 2020, Dr. Joseph submitted another article to ApSS.  *Id.* ¶ 5.  This one was titled "Life on Mars: Colonies of Photosynthesizing Mushrooms in Eagle Crater?" ("Life on Mars"), *see* Dkt 57-3 at 1, and featured photographs of the surface of Mars showing what Dr. Joseph describes as "thousands of mushroom-lichen-like specimens, attached by thin stems to rocks on the surface of Mars."  Compl. ¶ 5.  For this submission, Dr. Joseph again entered into a licensing agreement, whose terms were identical to those in the agreement for "Life on Venus."  *See id.* ¶¶ 24, 26; Dkt. 57-3 at 1-2, 5.  The Court considers this agreement as well even though it was not attached to the Complaint.  *See Chambers*, 282 F.3d at 152-53.

"Life on Mars" attracted "the attention of hundreds of reporters from around the world" during the submission process.  Compl. ¶ 5.  On April 17, 2020, one of the Editors-in-Chief of ApSS notified Dr. Joseph via email (the "April 2020 Email") that the journal "became aware of concerns expressed over the manuscript" and that any acceptance of "Life on Mars" could "only be considered following further independent peer review."  Dkt. 57-4; *accord* Compl. ¶ 6.  Dr. Joseph instead decided to withdraw "Life on Mars" from ApSS's consideration and published it in another journal.  Compl. ¶ 8.

Sometime in April 2020 after he withdrew "Life on Mars," Dr. Joseph "demanded" that ApSS remove "Life on Venus" from its website and refund him $3,200, an amount he apparently paid as part of the submission process.  *Id.* ¶¶ 9, 89.  On June 11, 2020, several individuals at ApSS responded to Dr. Joseph via e-mail (the "June 2020 Email").  Dkt 57-5; *see also* Compl. ¶¶ 10-11.  This e-mail explained that ApSS had "sought a fresh opinion" of "Life on Venus" from "two

independent expert reviewers." Dkt. 57-5 at 1.  The June 2020 Email provided Dr. Joseph with

the reviewers' conclusions and told him that ApSS had decided to retract the article.  In relevant

part it stated:

> [The reviewers'] conclusion is that the manuscript [of "Life on Venus"] is based
> largely on morphological comparisons which are superficial and flawed.  The
> manuscript incorrectly states the temperature range that life on Earth can exist and
> never fully addresses both the temperature of the surface of Venus nor the effect of
> the caustic environment.  Further, they regard the manuscript as speculative with
> little factual science as to how to detect life on other planets.  Geomorphologic
> comparisons for life detection are not robust and we must follow qualitative
> measures such as the ladder of life detection.  Further, there is now more robust
> ongoing work discussing Venus as a habitable environment.
>
> Based on the above advice the findings in the 'Life on Venus' paper are unreliable
> and we will now retract this article.
>
> In line with the journal and publisher policy we will proceed to publish a retraction
> notice to inform our readers that the article has been retracted.  The original article
> will remain on our website, but it will be linked to the retraction notice, the title
> will be modified to state Retracted Article, and the article pdf will be watermarked
> to indicate that it has been retracted.

*Id.* (internal citations omitted); *accord* Compl. ¶ 11.  The email also informed him that ApSS

typically does not issue refunds, but it had "agreed to make an exception in this case" and that the

"[c]ustomer [s]ervices team" would be in touch with him "to arrange the refund."  Dkt. 57-5 at 2.

On June 23, 2020, ApSS published the following notice alongside "Life on Venus" (the

"June 23, 2020 Notice"): "Readers are alerted that the conclusions of this article are subject to

criticisms that are being considered by the editors.  Editorial action will be taken as appropriate

once the investigation of the concerns is complete and all parties have been given an opportunity

to respond in full."  Compl. ¶ 17; *see also* Dkt 57-1 at 15.  Although it is not pleaded in the

Complaint, it appears that ApSS ultimately retracted "Life on Venus" on October 1, 2020.  Dkt.

57-6; *see also* Motion to Dismiss at 7.  The Court takes notice of this because Dr. Joseph relies

heavily on it in his brief filed in opposition to the instant motion.  Dkt. 62 ("Opposition") ¶¶ 72,

79-80, 90, 92-98, 100, 107.  The retraction notice stated:

> The Editors and the Publisher are retracting this article because, upon further review, in their judgment the article proffers insufficient critical assessment of the material presented and literature cited, and fails to provide a solid underpinning for the speculative statements made in the article which, in their view, invalidates the conclusions drawn.  The author does not agree to this retraction.

Dkt. 57-6.

## B.  Procedural History

On June 17, 2020, Dr. Joseph initiated this lawsuit, *see* Dkt. 1, and filed two amended complaints over the following month.  *See* Dkt. 2, 19.  The operative Complaint, Dkt. 19, alleges several causes of action styled as follows: (1) "Infringement of Copyright"; (2) "Breach of Contract, Tortious Interference"; (3) "Libel and Defamation"; (4) "Fraud and Unfair and Deceptive Trade Practices"; (5) "Personal Injury - Intentional Infliction of Emotional Distress, Malice"; and (6) "Negligence (42 U.S.C. § 1983)".  Compl. ¶¶ 72-102.[2]  The Complaint names the following individuals and entities as Defendants: Springer Nature, Springer, Springer Nature America, Inc., Springer Science + Business Media, LLC, Springer Verlag New York, LLC, Springer Nature Academic Publishing, Inc., and the two Editors-in-Chief of ApSS, Elias Brinks and Jeremy Mould. *Id.* ¶ 1.[3]  Dr. Joseph requests injunctive relief and "damages of $100 million US, from each Defendant for each cause of action."  Compl. ¶ 46.  In his Opposition, Dr. Joseph argues that he is actually entitled to $50 billion and explains that he would use this money "to finance and assemble a team of thousands of scientist[s] to perhaps make some of the greatest discoveries in science."

_____

[2] The Complaint alleges a seventh claim for relief called "Demand for Injunctive Relief." Compl. ¶¶ 103-06.  This is not an independent cause of action, and the Court construes this to mean that Dr. Joseph seeks injunctive relief as a remedy.

[3] The caption of the Complaint also names ten unknown individual sued in their "individual capacities" and as "co-conspirators," but the Complaint itself makes no mention of these individuals, does not bring any of the claims for relief against unknown individuals, and pleads no facts regarding these unknown individuals.

Opposition ¶ 132.

Only the two American Defendants, Springer Nature America, Inc. and Springer Nature Academic Publishing LLC, have appeared.  On November 16, 2020, these Defendants filed a motion to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  Dkt. 55.  Dr. Joseph opposed this motion on December 7, 2020.  Dkt. 62.  Defendants replied on December 14, 2020.  Dkt. 65.

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro*, 807 F.3d at 544, it need not "accept as true legal conclusions couched as factual allegations," *Lafaro v. N.Y.C. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

The Court must construe *pro se* submissions "liberally" and interpret them "to raise the strongest arguments that they suggest."  *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (per curiam) (internal quotation marks omitted).  But a *pro se* complaint still "must state a plausible claim for relief."  *Id.*  "Even in a *pro se* case . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted).

### III. Discussion

### A. Copyright Infringement

Dr. Joseph first alleges that Defendants violated the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, when they refused to remove "Life on Venus" from ApSS's website upon his request. Compl. ¶¶ 28, 72-76. This claim easily fails because Dr. Joseph granted ApSS a license to publish his article.

"To state a claim for copyright infringement, a plaintiff must allege 'both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001)). "A valid license to use the copyrighted work 'immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor.'" *Id.* (quoting *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007)). Thus, "[a] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998).

All parties seem to agree that Dr. Joseph owns the copyright in "Life on Venus" so the first element of copyright infringement is met. Compl. ¶ 4; Motion to Dismiss at 19. But Dr. Joseph cannot meet the second element because he entered into a contract that granted the publisher of ApSS "a non-exclusive, irrevocable and sub-licensable right, unlimited in time and territory, to . . . publish, distribute, transmit, [and] make available" the article "Life on Venus." Dkt. 57-2 at 2; *see also* Compl. ¶¶ 24-25. This is dispositive of this issue. *See Spinelli*, 903 F.3d at 197.

In his Opposition to the motion to dismiss, Dr. Joseph now claims that he never entered into an agreement with the publisher of ApSS regarding "Life on Venus." Opposition ¶¶ 46-47.

This contradicts the Complaint, which alleges the opposite.  Compl. ¶¶ 24-25.  Dr. Joseph offers

no explanation for this about-face, and it is puzzling because he continues to advance a breach of

contract claim based partially on this contract.  In his Opposition, he also appears to shift the focus

of his copyright infringement claim to the fact that Defendants printed the word "retracted" on his

article, which Dr. Joseph claims shows "[c]learly, obviously, [Defendants] have infringed on [his]

copyright."  Opposition ¶ 137.

None of these arguments have any merit.  Dr. Joseph's claim for copyright infringement

fails because he is a "copyright owner" who "grant[ed] a nonexclusive license" to the publisher of

ApSS "to use his copyrighted material."  *Graham*, 144 F.3d at 236.  Dr. Joseph fails to explain

why Defendants were required to comply with his demand that ApSS remove "Life on Venus"

from its website.  And he offers no plausible theory for why a retraction, or the printing of the

word "retracted" on his article, constitutes an infringement of his copyright.  Because the publisher

of ApSS "use[d] the copyright as agreed," Defendants are immunized from a claim of copyright

infringement.  *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) (quoting

*Blige*, 505 F.3d at 100).  This claim is therefore dismissed against all Defendants.[4]

**B. Breach of Contract and Tortious Interference with Contract**

The Complaint next alleges that Defendants breached contracts regarding "Life on Venus"

and "Life on Mars," and that Brinks and Mould tortiously interfered with one or both of the

contracts for these articles.  Compl. ¶¶ 77-82.  These claims fail.

In the Complaint, Dr. Joseph alleges that the contract for "Life on Mars" stated that

"Defendants would make the published work available to the public" but that they repudiated this

---

[4] Defendants argue that they are "entitled to an award of prevailing party attorneys' fees pursuant to 17 U.S.C. § 505," Motion to Dismiss at 19 n.8, but do not explain why.  The Court thus declines to exercise its discretion to award such fees under § 505 in this case.

after "reporters expressed interest" in the piece.  Compl. ¶ 26.  The agreement did not say this.

Instead, it stated that the publisher of ApSS "will *consider* publishing" the article, and that the

article was "[s]ubject to editorial acceptance."  Dkt. 57-3 at 1 (emphasis added).  Defendants thus

did not breach the agreement by deciding to subject the piece to additional rounds of review.

Further, Dr. Joseph admits that he was the one who "withdrew the 'Life on Mars' . . . article from

further consideration" by ApSS.  Compl. ¶ 8.  Thus, he pulled the plug before ApSS even decided

whether it would publish the piece.

Dr. Joseph's theory of breach with regard to the "Life on Venus" agreement is less clear,

but his core argument seems to be that Defendants breached this agreement when they said they

would retract the article.  *See id.* ¶¶ 31, 81.  This argument is unavailing because the agreement

specifically stated that the publisher of ApSS "may retract the Article or publish a correction or

other notice in relation to the Article if the [publisher of ApSS] considers in its reasonable opinion

that such actions are appropriate from a legal, editorial or research integrity perspective."  Dkt. 57-

2 at 5.  ApSS did exactly this.  There was therefore no beach here either.

Despite alleging in the Complaint that he entered into two agreements with Defendants

when he submitted his articles for publication, Compl. ¶¶ 24-26, and citing authority for the

proposition that "the click of a button accepting a license's terms serves as proof of a contractual

agreement," *id.* ¶ 27, Dr. Joseph abandons this theory in his Opposition and instead claims that he

"never signed, never saw, never read, and has no knowledge of any such agreement," Opposition

¶ 41; *see also id.* ¶ 47.  For support of this theory, Dr. Joseph argues that none of these agreements

exist because he conducted Google searches of the phrases "the Licensee may retract…" and

"retract the Article or publish…" and the results of the searches did not include a Springer or

Springer Nature website.  *Id.* ¶¶ 41, 47.  This argument is frivolous.  Just because Dr. Joseph did

not find the agreements in a list of search engine results on the Internet does not mean they do not exist.  This argument also is in complete contradiction with the fact that Dr. Joseph brings a breach of contract claim that necessarily relies on these agreements.[5]

The Court therefore dismisses Dr. Joseph's claim for breach of contract.  Thus, Dr. Joseph's claim for tortious interference necessarily fails as well.  *See Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424 (1996) (noting that "actual breach of the contract" is an element of a tortious interference with contract claim).

### C. Libel

The Court construes Dr. Joseph's claim for "libel and defamation" as one for libel, which is defined as defamation by "written expression."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (internal quotation marks omitted).  Under New York law, a libel claim consists of five elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability."  *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citing *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)).  It is difficult to glean the exact written statements at the center of Dr. Joseph's libel claim.  Construing the Complaint liberally, the Court considers any possible statements that Dr. Joseph may allege were libelous.

Dr. Joseph primarily relies on the April 2020 Email and the June 2020 Email.  Compl. ¶¶ 30-31.  Recall that the April 2020 Email informed Dr. Joseph that "Life on Mars" would need "further independent peer review."  Dkt 57-4; *see also* Compl. ¶¶ 6, 30.  The June 2020 Email

---

[5] As part of his breach of contract claim, Dr. Joseph cites a list of random statutes, including the Uniform Commercial Code and various New York state laws, such as New York General Business Law section 899-h, Compl. ¶ 79, a law dealing with student-athlete contracts. Dr. Joseph does not explain how any of these statues support his claims for breach, and the Court thus declines to consider them.

11

discussed issues with "Life on Venus" and notified Dr. Joseph that ApSS would "publish a retraction notice." Dkt 57-5; *see also* Compl. ¶¶ 11, 31. None of the statements in these emails were libelous because they were private communications to Dr. Joseph, and nothing indicates that they were ever published to a third party. *See Palin*, 940 F.3d at 809. In fact, the Complaint pleads no facts to suggest that these communications were ever seen by anyone besides Dr. Joseph. *See Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001) ("A defamatory writing is not published if it is read by no one but the defamed.") (quoting *Ostrowe v. Lee*, 256 N.Y. 36, 38 (1931) (Cardozo, *C.J.*)).

The Complaint also points to the June 23, 2020 Notice posted on ApSS's website alongside "Life on Venus." Again, this stated: "Readers are alerted that the conclusions of this article are subject to criticisms that are being considered by the editors. Editorial action will be taken as appropriate once the investigation of the concerns is complete and all parties have been given an opportunity to respond in full." Compl. ¶ 17; *see also* Dkt. 57-1 at 15. Dr. Joseph alleges that this statement was false because the criticisms were "manufactured by the Defendants" and "[t]here [was] no investigation." Compl. ¶ 17 (internal quotation marks omitted). Dr. Joseph's allegations are impossible to accept when the June 2020 Email, upon which Dr. Joseph relies, informed him that ApSS asked "two independent expert reviewers" to review "Life on Mars," and they concluded that the article was based on data that were "superficial and flawed." Dkt. 57-5 at 1. Dr. Joseph's conclusory assertions to the contrary do not make his allegations plausible. *See Chavis*, 618 F.3d at 170. In addition, the "Life on Venus" agreement allowed ApSS to "publish a correction or other notice in relation to the Article if the licensee considers in its reasonable opinion that such actions are appropriate from a legal, editorial or research integrity perspective." Dkt. 57-2 at 5. Thus even if the June 23, 2020 Notice was defamatory, Dr. Joseph still would not have an

actionable claim because he consented to the publication of this notice. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015).

The Complaint also alludes to two other statements that may form the basis for Dr. Joseph's libel claim. Dr. Joseph alleges that Defendants "informed [him] they would print on the first page of the article[] that they had judged ["Life on Venus"] to be unfit for publication, despite all evidence it is a major contribution to the scientific literature." Compl. ¶ 10. He also claims that "Defendants informed reporters of their decision thus publicly humiliating and defaming [him]." *Id.* ¶ 30. It is unclear whether these statements were separate from those already discussed. To the extent they are not, Dr. Joseph pleads no facts to explain any details about them. *See Camp Summit of Summitville, Inc. v. Visinski*, No. 06 Civ. 4994 (CM), 2007 WL 1152894, at *10 (S.D.N.Y. 2007) (explaining that for a libel claim, a plaintiff must identify "the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated") (internal quotation marks omitted). "Mere conclusory statements that the claimant was disparaged by false statements are insufficient to state a defamation claim." *Id.* Even if Dr. Joseph had pleaded additional facts supporting these two statements, they would still fail. The first statement would fail for the same reasons as the April 2020 Email and the June 2020 Email because nothing suggests it was published to a third party. *See Albert*, 239 F.3d at 269. And the second statement would fail because even construing this in the light most favorable to Dr. Joseph, all it would convey is that ApSS made a "decision" to retract an article, and Dr. Joseph recognizes that this in fact happened. *See* Opposition ¶ 93; Dkt. 57-6. The Court thus struggles to see how such a statement would have been false.

Finally, both parties spill much ink discussing ApSS's ultimate retraction of "Life on Venus" on October 1, 2020. This occurred after Dr. Joseph filed the Complaint, but the Court will

consider whether this statement may be libelous for the limited purpose of determining whether

amending the Complaint to add such an allegation would be futile. *See Cortec Indus., Inc. v. Sum*

*Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to

dismiss to allow leave to replead. . . .  Of course, where a plaintiff is unable to allege any fact

sufficient to support its claim, a complaint should be dismissed with prejudice.").

The statements in the retraction notice were based on the "judgment" of the editors and

publisher and offered their assessment of the material presented in "Life on Venus."  The retraction

notice is thus a nonactionable opinion and could not form the basis for Dr. Joseph's libel claim.

*Biro*, 883 F. Supp. 2d at 459 ("Under both New York and federal law, statements of pure opinion

are not actionable as defamation.") (internal quotation marks omitted).  This is especially the case

when the opinion at issue is ultimately a critique of a scientific work.  At bottom, ApSS and Dr.

Joseph disagree about whether certain material supports the conclusion that life may exist on other

planets.  Perhaps future generations will know the answer to this question.  But it remains one of

the great mysteries of our time, and one that the Court has no business solving.  For that reason

alone, ApSS's statements critiquing Dr. Joseph's work cannot be libelous.  *See ONY, Inc. v.*

*Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 492 (2d Cir. 2013) ("[A]s a matter of law,

statements of scientific conclusions about unsettled matters of scientific debate cannot give rise to

liability for damages sounding in defamation.").[6]

### D.  Other Tort Claims

Dr. Joseph also advances claims for "personal injury," negligence, and intentional

infliction of emotional distress through his fifth and sixth claims for relief.  Compl. ¶¶ 92-102.

---

[6] Dr. Joseph again cites a smattering of irrelevant statutes in support of his libel claim, Compl. ¶ 86, including 42 U.S.C. § 1983.  Dr. Joseph fails to offer any explanation for how these statutes relate to his claims, and the Court fails to see any plausible theory.

Each of these claims is duplicative of Dr. Joseph's libel claim because he "seek[s] damage[s] for reputational injury only." *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, No. 08 Civ. 6463 (DAB), 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009). For example, Dr. Joseph explains that he "has been twice absolutely shocked and sickened by the conduct of these Defendants and threats to destroy his reputation." Compl. ¶ 94. Dr. Joseph's may not recast his libel claim under these various other causes of action. *See Jain*, 2009 WL 3166684, at *9 ("New York law considers claims sounding in tort to be defamation claims . . . where the entire injury complained of by plaintiff flows from the effect on his reputation." (internal quotation marks omitted)); *see also Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (holding that the district court correctly dismissed other tort claims as duplicative of a defamation claim when the factual allegations were "virtually identical").[7]

Dr. Joseph's fourth claim for relief alleges three separate causes of action: fraud, false advertising, and deceptive trade practice. Compl. ¶¶ 87-91. He alleges two instances which potentially give rise to these claims. First, he says that Defendants failed to refund him $3,200 as promised. *Id.* ¶ 89. Second, he claims that Defendants failed to follow their advertised retraction policy. *Id.* ¶¶ 90-91.

Taking the claims for false advertising and deceptive trade practice first, the Complaint relies on a confusing litany of statutes including 18 U.S.C. § 1038, which deals with false information related to, *inter alia*, "the death, injury, capture, or disappearance of a member of the Armed Forces of the United States during a war or armed conflict," and various sections of the

---

[7] As with his other claims, Dr. Joseph relies on statutes that make no sense as support for these other tort claims. Compl. ¶ 29. For example, he cites 18 U.S.C. § 2255, which sets forth civil remedies for personal injuries suffered by minors who were victims of sexual abuse. Again, Dr. Joseph offers absolutely no indication how the statutes he cites are relevant here, and the Court declines to engage in a lengthier discussion as to why they offer Dr. Joseph no recourse.

New York Penal Code, including sections 190 (definitions of terms related to issuing a bad check) and 190.65 (scheme to defraud in the first degree).  Compl. ¶ 90.  Construing the Complaint liberally, the Court assumes Dr. Joseph intended to bring these claims under New York's consumer protection statute, N.Y. Gen. Bus. Law §§ 349-350,  or possibly the Lanham Act, 15 U.S.C. § 1125.  Regardless of the cause of action, these claims fail.

The crux of these two claims seems to be that Defendants failed to follow ApSS's procedures for retracting an article.  *See* Compl. ¶¶ 90-91.  The Complaint offers absolutely no explanation for what procedures ApSS advertised and did not follow.  But according to Dr. Joseph's Opposition, it seems that his gripes are (1) ApSS did not listen to his complaint against ApSS's editors, Opposition ¶ 77; and (2) Springer's website states it follows "COPE guidelines," but "they violated all COPE guidelines," *id.* ¶ 78.  Even if these facts were alleged in the Complaint, they are precisely the type of conclusory allegations that fail to state a claim.  *See Chavis*, 618 F.3d at 170.  Dr. Joseph offers no explanation about what the "COPE guidelines" are, how Defendants failed to follow them, or how any of this would have misled a consumer.  *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014); *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013).  Moreover, Dr. Joseph agreed that ApSS could retract his article or "publish a correction or other notice," Dkt. 57-2 at 5, and that is exactly what happened here.  No facts suggest anything that sounds in false advertising or deception.

The exact cause of action for Dr. Joseph's fraud claim is similarly unclear.  But regardless, for any fraud claim, a plaintiff must "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Thus the complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and

16

when the statements (or omissions) were made, and (4) explain why the statements (or omissions)

are fraudulent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d

Cir. 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d

168, 187 (2d Cir. 2004)).

Dr. Joseph's primary theory of fraud seems to be that ApSS said it would refund him $3,200

but never did.  Compl. ¶ 89.  Defendants only response to this is that Dr. Joseph "fails to specify

the speaker, where or when the statements were made, and, most importantly, why they were

fraudulent and how the statements indicate fraudulent intent."   Motion to Dismiss at 22.

Defendants' argument is difficult to accept in part because Defendants attached the statement at

issue as an exhibit in this action.  *See* Dkt. 57-5.  So many of Defendants' questions are answered

by their own filing, despite the fact that Dr. Joseph did not include these details in the Complaint.

For example, the speaker appears to be "The Editors-in-Chief and Publisher" of ApSS or the person

behind the email address listed on the document.  Dkt. 57-5 at 1-2.  And the statement—*i.e.*, "We

do not refund the APC as standard policy, but we have agreed to make an exception in this case."—

appears to have been made via email at 10:00 p.m. on June 11, 2020.  *Id.* at 1-2.  Nonetheless,

Defendants are correct that Dr. Joseph did not specify why this statement was fraudulent or how

this statement indicates fraudulent intent.  One solution would be to allow Dr. Joseph to amend the

Complaint to add additional facts.  *See Monroe v. Cnty. of Rockland*, No. 21 Civ. 2472 (CM), 2021

WL 1268500, at *3 (S.D.N.Y. Apr. 5, 2021) ("District courts generally should grant a self-

represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment

would be futile.").

But here, amendment in federal court would be futile.  "[A] district court 'may decline to

exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original

jurisdiction.'"  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28

U.S.C. § 1367(c)(3)).  To the extent Dr. Joseph alleges that diversity jurisdiction exists over this

claim because he suffered hundreds of millions of dollars in damages, *see* Compl. ¶ 46, the Court

disagrees because Dr. Joseph pleads facts that suggest that his losses amount to no more than

$3,200 for this claim,  *id.* ¶ 89.  *See* 28 U.S.C. 1332(a) (allowing for federal diversity jurisdiction

if "the matter in controversy exceeds the sum or value of $75,000").  Dr. Joseph has already

amended his Complaint twice, and the Court declines to allow him to amend it again to plead

additional facts in support of his fraud claim.  Instead, the Court will dismiss this claim without

prejudice to Dr. Joseph pursuing it in state court if he wishes.

*        *        *

Several Defendants, all of whom are located outside the United States, have not appeared

in this action, and there are several pending motions in which Dr. Joseph has requested that the

Court allow for alternative service for these individuals and entities.  Because the Court concludes

that the claims here (with the possible exception of the fraud claim) are frivolous, it need not

consider whether alternative service should be allowed or wait for the other Defendants to appear

in this action.  The reasons that support dismissing the Complaint as to the two appearing

Defendants would also support dismissal as to the non-appearing Defendants.  Thus, the Court

dismisses the Complaint in full.  *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d

362, 364 (2d Cir. 2000) (holding that "in order to preserve scarce judicial resources . . . district

courts may dismiss a frivolous complaint *sua sponte*.").

18

## IV.  Conclusion

For the reasons stated, Defendants' motion to dismiss is granted.  The Court will not allow Dr. Joseph to amend his complaint for a third time because any amendment would be futile.  Dr. Joseph's claim for fraud based on the theory that Defendants allegedly failed to refund him $3,200 as promised is dismissed without prejudice.  All of Dr. Joseph's other claims are frivolous, and the Court dismisses them with prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 55, and all other pending motions, and to close this case.

The Clerk of Court is also respectfully directed to mail a copy of this Opinion and Order to Plaintiff.

SO ORDERED.

Dated: April 12, 2021
New York, New York

JOHN P. CRONAN
United States District Judge